COOPER v. CHEROKEE VILLAGE DEVELOPMENT CO., INC.

5-2921                                        364 S. W. 2d 158

Opinion delivered January 28, 1963.

*Harry L. Ponder,* for appellant.

*Herschel H. Friday, Jr.* and *John Mac Smith,* for appellee.

FRANK HOLT, Associate Justice. Appellant seeks to have a financing or loan agreement between the appellees declared usurious and, therefore, invalid pursuant to the provisions of Article 19, § 13 of the Constitution of the State of Arkansas. He asks that any existing indebtedness under such contract be cancelled and forfeited and that a permanent injunction be issued against appellees.

Appellee, Cherokee Village Development Company, Inc., [hereafter referred to as Cherokee] and appellee, Northern Financial Corporation [hereafter referred to as Northern] each answered, entered its appearance and submitted to the jurisdiction of the court. In separate answers, each appellee admits that the loan agreement provides for a greater rate of interest than 10% per annum which, under Arkansas law, would constitute usury but alleges, however, that the substantive law of New York, rather than Arkansas, is applicable. Appellees affirmatively ask for a declaratory judgment holding the agreement valid and enforceable. The cause was submitted upon the pleadings and a stipulation of facts. The trial court upheld appellees' contention that the substantive law of New York governs and the agreement is valid and enforceable.

The pertinent facts agreed upon are as follows. Appellant is a citizen and resident of the State of Arkansas and is the owner of 600 shares of the capital stock

of appellee, Cherokee. Cherokee is a corporation organized under and existing by virtue of the laws of the State of Arkansas with its principal place of business in Sharp County, Arkansas. Appellee, Northern, is a corporation organized under and existing by virtue of the laws of the State of New York and has its principal place of business in the City of New York, New York. Northern has not qualified to do business in the State of Arkansas and has no office or place of business in Arkansas. Northern is a commercial financing company.

Cherokee is the owner, subject to rights of way, easements, liens, lots sold and contracts for the sale thereof, of a tract of real estate situated in Arkansas and containing approximately 6,375 acres. Cherokee has developed and improved said tract of real estate, platted portions thereof into lots, has sold some of said lots and entered into contracts of sale with reference to other lots. It will continue to do so in the future.

In early 1962, Cherokee entered into negotiations with Northern to obtain financing for these operations. These negotiations between representatives of Cherokee and Northern took place in Arkansas and in New York. The negotiations led to an agreement between between the parties dated April 30, 1962, a copy of which was made a part of the record. The loan agreement drafted by Cherokee, the borrower, was executed and deliverd in New York City and the agreement expressed the intent of the parties that the laws of the State of New York shall govern their contractural rights and duties.

Generally stated, the loan agreement classifies the aforesaid contracts of sale into two types of ''eligible paper''. One type, Class A Paper, being the contracts on which at least six installment payments, but less than twelve, have been paid to Cherokee by the purchaser. The other type, Class B Paper, being contracts on which twelve or more such installment payments have been paid. Such contracts, designated by the loan agreement as eligible paper'', are also designated as ''collateral'' and are to be pledged, assigned and delivered by Cherokee to

Northern in New York to secure the loan. Northern agrees to advance and deliver to Cherokee, by depositing in a New York bank account of Cherokee, as requested from time to time, such sums as shall not exceed thirty-three and one-third per cent of the unpaid balance of Class A Paper and as shall not exceed fifty per cent of the unpaid balance of Class B Paper. Cherokee agrees to pay interest upon the advances so made to it at the rate of 1/27 of one per cent per day (equalling approximately 13⅓ per cent per annum). There is sufficient eligible paper to permit a loan well in excess of one million dollars.

Under the terms of the loan agreement Cherokee agrees to continue to make collection of payments under the said contracts of sale which are assigned as collateral. Such collections are to be received by Cherokee in trust for Northern and deposited in a special bank account in the Bank of Ash Flat, Arkansas, maintained in Cherokee's name. The funds so received are to be remitted daily by check to Northern, these being the only withdrawals from this bank account. All such remittances are to be delivered to Northern in New York and are not to be effective until three days after receipt to permit bank clearance and collection. When thus collected, the remittances are credited by Northern against Cherokee's indebtedness. Upon any contract of sale being paid in full by the buyer, Northern must redeliver such contract to Cherokee. The loan agreement is to continue in effect from year to year until terminated as specified in the agreement. Cherokee reserves the right to terminate this agreement upon thirty days notice to the event it is able to secure necessary refinancing from commercial banks, other institutional lenders, or public financing.

The appellees have been operating under this agreement with the said contracts of sale being assigned and pledged to Northern, loans being made thereon to Cherokee, and payments being made on those loans including interest at a rate of more than 10 per cent per annum (approximately 13⅓% per annum).

Appellees, Cherokee and Northern, have filed a financial statement with the Clerk of Sharp County, Arkansas, and the Secretary of State, pursuant to certain provisions of the Uniform Commercial Code, Ark. Stats. 85-1-101, *et seq.* (Act. 185 of the Acts of Arkansas of 1961).

It is undisputed that if the substantive law of Arkansas is applicable, the loan agreement is usurious and void; however, if the substantive law of New York is applicable, the contract is valid and enforceable.

On September 17, 1962, the trial court rendered its decree holding that the validity, interpretation and effect of the loan agreement are to be determined by the substantive law of New York and, therefore, it is valid and enforceable. The court dismissed the appellant's complaint with prejudice. From this decree appellant brings this appeal.

For reversal appellant pursues five points:

(1)  The transaction is one affecting the title to Arkansas land and its validity is to be determined by Arkansas law.

(2)  Arkansas is the state with the most significant contracts and therefore Arkansas law must govern the contract.

(3)  The Uniform Commercial Code as enacted by Arkansas requires that the contract be governed by Arkansas law.

(4)  Even if the validity of the contract is to be determined by New York law, Arkansas substantive law is applicable under the doctrine of *Renvoi*.

(5)  The strong public policy of Arkansas against usurious contracts demands a finding of invalidity.

We consider these points in the order presented.

(1)  Appellant's theory is that the contracts of sale, which are the principal collateral, when assigned, pledged and delivered to Northern, in effect transfer an interest

in the retained legal title to Arkansas land. Further, that in the event of any default by Cherokee, Northern is authorized to dispose of the contracts at either public or private sale, thereby effecting another transfer of title to the Arkansas land.

The title to land is controlled by the law of the situs of the particular land in question. *O'Bar* v. *Hight,* 169 Ark. 1008, 277 S. W. 533; *Nakdimen* v. *Brazil,* 137 Ark. 188, 208 S. W. 431; *Polack* v. *Steinke,* 100 Ark. 28, 139 S. W. 538; Lefler, Conflict of Laws, (1959) § 140.

However, we think the facts in the instant case are more closely analogous to the cases in which the borrower has executed a promissory note in another state, payable in such other state, to be secured by a mortgage on Arkansas land. In these note and mortgage cases, this court is committed to the rule that the governing law is to be determined under the ordinary choice of law rules for contracts, just as if there were no mortgage. *Smith* v. *Brokaw,* 174 Ark. 609, 297 S. W. 1031; *Boston Mutual Life Inc. Co.* v. *Newton,* 174 Ark. 547, 297 S. W. 1035; *Dupree* v. *Virgil R. Coss Mortgage Co.,* 167 Ark. 18, 267 S. W. 586; *Tenny* v. *Porter,* 61 Ark. 329, 33 S. W. 211. However, this court is not committed to any choice of law rules of contracts which is a sham to evade the usury laws of our state.

In *Tenny* v. *Porter, supra,* this court stated the rule:

"The law of the place which determines the validity of a contract secured by a mortgage determines whether the mortgage be valid or usurious, irrespective of the place where the land which is subject of the mortgage is situated * * *."

It is our opinion that the situs of the land is not controlling as to which state's laws are to be applied in determining the validity of the loan agreement in this case.

(2) In determining what law governs the validity of a multistate contract four different bases have been used: (1) The law of the state in which the contract was made; (2) the law of the state in which the contract is

to be performed in its most essential features; (3) the law of the state which the parties intended to govern the contract, provided that state has a substantial connection with the contract; and, (4) the law of the state which has the most significant contracts with the matter in dispute (also known as the "center of gravity" or "grouping of contracts" (theory). See Lefler, Conflict of Laws, (1959) §§ 124, 125.

Arkansas has, on different occasions, applied the first three of these theories. *Smith* v. *Brokaw, supra,* (place of making); *American Farm Mtg. Co.* v. *Ingraham,* 174 Ark. 578, 297 S. W. 1039, (place of performance); *McDougall* v. *Hachmeister,* 184 Ark. 28, 41 S. W. 2d 1088, (intent of the parties). The "center of gravity" theory, which appellant urges upon us, was inaugurated in *Auten* v. *Auten,* 308 N. Y. 155, 124 N. E. 2d 99. This court has not found occasion to employ it nor do we now find it necessary in this case.

From a review of the facts in this case we are of the opinion that upon the application of any of the three traditional rules, recognized by this court, that the law of New York is controlling.

This agreement was drafted by the borrower, Cherokee, and offered to the lender, Northern, in New York. It was in New York that this contract was executed and delivered or where the last act necessary to complete the contract and impose legal obligations was consummated. The contract was made in New York. Leflar, Conflict of Laws, (1959) § 122; Restatement, Contracts, § 74; Williston, Contracts (3rd Ed. 1957) § 97; *Smith* v. *Brokaw, supra.*

As to performance, it is in New York where all advances, repayments and remittances are to be made and all collateral assigned. It is in New York that the contract is to be performed in the main or its essential features. *American Farm Mtg. Co.* v. *Ingraham, supra.*

By the terms of the contract, it is the express intention of the parties that the laws of New York govern its validity. Cherokee and Northern had the **right to select**

and intend the law of New York to govern the contract since New York has substantial contacts with the contract. *McDougall* v. *Hachmeister,* 184 Ark. 28, 41 S. W. 2d 1088; *Dupree* v. *Virgil R. Coss Mortgage Co., supra.* Of course, they could not validly agree to such if New York had no substantial connection with the agreement.

(3) We are only concerned in this case with the question of usury. Thus, we do not reach the question of whether the Uniform Commercial Code, Ark. Stats. 85-1-101, supports the appellant's argument because the Uniform Commercial Code does not affect the Arkansas law on usury. See Ark. Stats. 85-9-201.

(4) *Renvoi* is the doctrine under which the court of the forum, in resorting to a foreign law, adopts the rules of the foreign law as to conflict of laws, which rules may in turn refer the court back to the law of the forum.

We deem it unnecessary to decide whether this court will follow the *renvoi* doctrine in this case. Suffice it to say that if this court applied the whole law of New York, which includes the New York law on conflict of laws, the result in this case would be the same as we reach on other grounds. In determining which state's law governs the validity of a contract, New York has apparently committed itself to the "center of gravity" or "grouping of contracts" theory. *Auten* v. *Auten, supra.* Applying that theory to the instant facts, it is evident that New York is the state with the most significant contacts with the matter in dispute.

(5) This court has consistently inclined toward applying the law of the state that will make the contract valid, rather than void. *Whitlock* v. *Cohn,* 72 Ark. 83, 80 S. W. 141; *Dupree* v. *Virgil R. Coss Mortgage Co., supra; American Farm Mtg. Co.* v. *Ingraham, supra; Wilson-Ward Co.* v. *Walker,* 125 Ark. 404, 188 S. W. 1184.

This is not a case of a cloak for usury or where the parties to a wholly Arkansas contract have sought to avoid the Arkansas usury law by having the validity of the contract determined by the law of a state having no substantial connection with the contract. On the contrary,

this is essentially a New York contract. It is quite natural for a New York lender to loan its money in New York, to require it to be repaid in New York and to stipulate that the contract be governed by familiar New York law. These are *reasonable requirements* for a lender to exact.

The parties in this case were dealing fairly with each other with full disclosure. Cherokee drafted the agreement and presented it to Northern for acceptance. Cherokee reserved the right to terminate the agreement on thirty (30) days notice if it were able to obtain the required refinancing from commercial banks, other institutional lenders, or public financing. We see nothing so reprehensible about this agreement that it would require us to discard our recognized rules of conflict of laws in order to hold the agreement to be void.

The decision of the lower court is, therefore, affirmed.